IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AR, through his mother and
next friend, RM-G, and RM-G,

        Plaintiffs,

vs.
                                  CIV 13-0720 KBM/KK
                                    Consolidated with
                                    CIV 13-0350 KBM/KK
                                    CIV 13-0755 KBM/KK

LAS VEGAS CITY SCHOOLS, THE SCHOOL
BOARD OF THE LAS VEGAS CITY SCHOOLS,
SHERYL McNELLIS MARTINEZ, in her official
capacity as Superintendent of the Las Vegas City
Schools, and in her individual capacity; and
RICHARD ROMERO, LESLIE DAMON and
LORENA CASTRO-GARCIA, in their individual
capacities,

        Defendants.

# MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to State a Claim and for Qualified Immunity (*Doc. 24*), which was fully briefed on February 4, 2014.  Pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 73, the parties have consented to have me serving as the presiding judge and entering final judgment.  *See, Docs. 10, 11, 12.*  The Court has reviewed the motion, the briefs submitted by the parties and the relevant law.  Having given due consideration to the arguments of the parties, the Court finds that the motion is well taken in part and will be granted in part.

## I.  Standard of Review on a Motion to Dismiss

In order to survive a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the United States Supreme Court has held that:

> [A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

Further, "where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not shown—that

the pleader is entitled to relief."  *Id.* at 679 (internal quotations and citations omitted).

Additionally, "[a] pleading that offers labels and conclusions or a formulaic

recitation of the elements of a cause of action will not do.  Nor does a complaint suffice

if it tenders naked assertion[s] devoid of further factual enhancement."  *Id.* at 678

(internal quotations and citations omitted).  "While the 12(b)(6) standard does not

require that Plaintiff establish a prima facie case in her complaint, the elements of each

alleged cause of action help to determine whether Plaintiff has set forth a plausible

claim." *Khalik v. United Air Lines,* 671 F.3d 1188, 1192 (10th Cir. 2012).  Finally, "[a]

court reviewing the sufficiency of a complaint presumes all of plaintiff's factual

allegations are true and construes them in the light most favorable to the plaintiff."  *Hall

v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir.1991).

## II.  <u>The Allegations of the First Amended Complaint</u>

AR was born in 1999, and is currently 14 years old.  *Amended Complaint*,

*Doc. 18* at 2.  AR is legally blind and cannot read print.  *Id.* at 4.  He also has

osteogenesis imperfecta which causes him to be more susceptible to breaking bones.

*Id.*  AR has "normal to above normal intelligence" and "he can function normally and

access the general education curriculum of a public school at the same level and in the

same manner as his non-disabled peers, so long as his disabilities are reasonably

accommodated."  *Id.*  Because of his disabilities, AR requires specialized instruction in

Braille, orientation and mobility ("O&M"), including the use of a cane, assistive

technology, independent living skills, self-determination, self-advocacy, and social

interaction.  *Id.* at 5, 6-7.  This specialized instruction requires a licensed and

adequately-trained Teacher of the Visually Impaired ("TVI") and transcription of learning

materials into Braille.  *Id.* at 5-6.

### A.  <u>2010-2011 School Year (Fourth Grade)</u>

For his first few years of school, AR attended the New Mexico School for the

Blind and Visually Impaired ("NMSBVI") in Alamogordo, New Mexico, which required AR

to live away from his home and family.  *Id.* at 8.  AR returned to his home district in Las

Vegas, New Mexico for the 2010-2011 school-year and began attending Sierra Vista

Elementary School ("Sierra Vista") in the Las Vegas City School District, which is

governed by the School Board of the Las Vegas City Schools ("District").  *Id.* at 2, 5.

Although RM-G advised the District in the spring of 2010 that AR would be attending

Sierra Vista in the fall, the District did not have a TVI or O&M specialist at the beginning

of the year, and AR's Individual Education Plan ("IEP") was developed without the input

of a TVI or O&M specialist.  *Id.* at 8.

When Plaintiff RM-G voiced her concerns that AR's need for accommodation was not being addressed to the then-Superintendent for the District, Defendant Richard Romero, he "flew into a rage and yelled at RM-G about bringing AR back to his home school district and what was the reason that the District should have to pay for AR's education." *Id.* at 9.  After RM-G filed a complaint with the New Mexico Public Education Department, the District agreed to obtain a TVI and posted the position on the District's website.  *Id.*  The District did no other advertising or recruiting until 2013. *Id.*

During the 2010-2011 school year, the District did not furnish AR with textbooks in Braille for his social studies, science, Spanish, or math classes, nor did it produce Braille transcriptions of daily written materials distributed to AR's non-disabled classmates.  *Id.* at 10.  Additionally, the District did not provide any O&M services for AR.  *Id.*  While the District arrange for after-school services for AR, the instructor was unlicensed and unfamiliar with the specialized instruction for visually impaired students. *Id.* The District provided only "sporadic" assistance in the classroom.  *Id.*  The District did not offer Extended School Year services ("ESY") during the summer of 2011.  *Id.*

B. 2011-2012 School Year (Fifth Grade)

When AR began the fifth grade in 2011, his Braille reading fluency was at approximately a third-grade level.  *Id.* at 10.  That year, the District assigned Leighandrea Sandy to provide services to AR.  *Id.*  Although she was not a licensed TVI, Ms. Sandy was in the process of obtaining her TVI license and was being mentored by a licensed TVI.  *Id.* at 10, 11.  Ms. Sandy's mentor recommended

4

increased services for AR, but those recommendations were rejected by the District, which decided to provide AR with twenty hours of TVI services per week. *Id.* at 11. However, AR did not receive twenty hours of TVI services per week. *Id.*

Again, the District only supplied portions of AR's textbooks and educational materials in Braille. *Id.* at 12. Some Braille versions were not provided at all. *Id.* The majority of AR's homework was not in Braille, requiring AR to depend on his parents for assistance and spend an average of four hours each school night to complete his homework. *Id.* Further, the District did not provide O&M services or adaptive physical education, thereby precluding AR from participating in physical education classes. *Id.* at 13.

At the end of his fifth-grade year, AR's IEP required 20 hours of services by a TVI. *Id.* at 11. The District promised to provide AR with Extended School Year ("ESY") services, but those services were not made available until just before the following school year in August of 2012. *Id.* at 13. Additionally, the services provided were limited and performed by an unlicensed TVI. *Id.*

C. 2012-2013 School Year (Sixth Grade)

In the fall of 2012, AR began attending Memorial Middle School. *Id.* at 5. AR's sixth-grade school year was much like his fourth and fifth grade years. The District did not give AR textbooks or classroom materials in Braille for his math, language arts, or science classes. *Id.* at 19. In history class, AR's teacher would present materials on the board which were not produced to AR in Braille; instead, texts were read aloud to AR. *Id.* AR's teachers would routinely allow AR to skip assignments or only complete portions of assignments and base his grades on the modified amount of work. *Id.*

AR was allowed to participate in only one elective class, art, while sighted students were allowed two elective courses.  *Id.* at 14.  Further, AR was pulled out of his art class one day per week for 50 minutes of "social work."  *Id.*  The IEP, however, only recommended 15 minutes of social work per week and only on an "as needed" basis.  *Id.* at 21-22.   The decision to pull AR out of Art class for social work services was unilaterally made by Defendant Castro-Garcia, the social worker assigned to assist AR.  *Id.* at 22, 23.

Castro-Garcia called the pull-out sessions "group counseling sessions."  *Id.* at 23.  Some sessions included written materials that were not transcribed into Braille.  *Id.* at 23, 24.  Several of the group counseling sessions included activities that were inappropriate for AR due to his visual impairment.  *Id.* at 24–25. For example, one session included an activity with a basketball that resulted in a sighted student throwing the ball at AR and hitting him in the face.  *Id.* at 25. Several sessions included creating "panoramic eggs" where small objects were placed inside a softball sized egg.  *Id.*  AR was also asked to use his eyes to "track throughout the mazes."  *Id.*

In December of 2012, Ms. Sandy resigned her position with the District.  *Id.*  The District did not hire a qualified, licensed TVI instructor for AR.  Instead, the District replaced Ms. Sandy with a special education instructor, Eugene Herrera, who had no experience, training, or qualifications to teach or provide services to a visually impaired student.  *Id.* at 15.  Without an understanding of Braille or AR's assistive technology, Mr. Herrera was unable to properly transcribe materials or provide specialized instruction in assistive technology.  *Id.* at 15-16.   In March of 2013, the District hired Rose Montoya to work with AR.  *Id.* at 17.  Ms. Montoya did not know Braille, was not qualified to teach

6

or transcribe Braille, and did not have any experience working with a visually impaired student who uses Braille.  *Id.*  AR was without consistent O&M services during the 2012-2013 school year and was often at school without his cane.  *Id.* at 20.  As in elementary school, the lack of O&M services prevented AR from participating in physical education in Middle School.  *Id.* at 21.

AR needs assistive technology, including an Apex Braille Note device and laptop, and initially was able to take this school-issued equipment home to use for school-related purposes.  *Id.* at 26.  AR relies on these devices to assist him in completing homework, reading, using the internet and email, and listening to books.  *Id.*  After AR accidentally damaged his Apex device by dropping it at school, the District would no longer let AR take the Apex or laptop home unless RM-G signed an Equipment Release that required her to take full financial responsibility for any damage to the school-issued devices.  *Id.* at 26-27.  Even after RM-G signed the requested release, however, AR was not allowed to take the equipment home.  *Id.* at 27.

Plaintiffs contend that the District's delay and denial of Braille instruction and transcription has set back AR's education.  *Id.* at 6.  They maintain that the District's delay and inconsistent O&M training caused AR to lose skills and confidence with his cane.  *Id.* at 7.  Plaintiffs further allege that the District's denial of access to assistive technology negatively affected AR's academic progress and segregated him from his peers.  *Id.*

## III. __The Claims Set Forth in the Amended Complaint and Procedural Posture__

In late 2012, RM-G filed her first request for a Due Process hearing pursuant to the Individuals with Disabilities Act ("IDEA"), raising issues with regard to AR's access

to the general curriculum, access to the Expanded Core Curriculum ("ECC")[1], and denial of access to physical education, elective classes, and ESY services.  *Id.* at 14. The Due Process Hearing Officer ("DPHO") issued her decision on March 1, 2013, which addressed only alleged IDEA violations occurring in the two-year period from November 15, 2010 through November 15, 2012.  *Id.* at 16.  Then on March 22, 2013, RM-G filed a second Due Process complaint to address the District's failure to provide a certified TVI.  *Id.* at 16.  The DPHO issued her decision on the second complaint July 8, 2013.  The hearing officer's decisions are the subject of the two administrative appeals consolidated with this case.[2]

In his first cause of action, AR alleges that the District violated Section 504 of the Rehabilitation Act ("Section 504") and Title II of the Americans with Disabilities Act ("ADA").  Specifically, AR contends that the District was deliberately indifferent to federal disability laws which resulted in discrimination on the basis of AR's disability.  *Id.* at 29-31.   In his second cause of action, pursuant to 42 U.S.C. § 1983, AR accuses the District of violating the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment for discriminating against him on the basis of his disability.  *Id.* at 32-36.  AR's third cause of action is similarly based on § 1983 and alleges violations of his Fourteenth Amendment substantive due process rights for his required participation in "group counseling."  *Id.* at 36-37.  Finally, AR's fourth cause of action seeks relief for attorney's fees pursuant to the IDEA as the prevailing party to the due

---

[1]   "The 'Expanded Core Curriculum' is characterized as a set of additional skills that visually impaired students have to learn in order to access visual curricula, plus additional areas of instruction that a blind child needs to receive, because a blind child cannot learn incidentally by casual observation."  *Doc. 18* at 5

[2]   As requested by Plaintiffs in CIV 13-0350 KBM/KK, the Court recently dismissed the claims seeking partial judicial review of the hearing officer's decision in NMPED 1213-19 but preserved their claims for attorney fees and costs incurred in association with that administrative proceeding.

process administrative hearing.  *Id.* at 37.  In their prayer for relief, Plaintiffs seek

declaratory and injunctive relief in addition to damages.  *Id.* at 38.

Defendants' Motion seeks the dismissal of all of AR's claims for failure to state a

claim, including Plaintiffs' prayer for declaratory and injunctive relief.  For the reasons

discussed below, the Court grants the motion in part.

## IV.  Discussion

### A.  First Cause of Action:  Discrimination under Section 504 and the ADA

Section 504 of the Rehabilitation Act prohibits discrimination against disabled

persons who are otherwise qualified for participation in programs receiving federal funds

and provides:  "[n]o otherwise qualified individual with a disability . . . shall, solely by

reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance . . . ."  29 U.S.C. § 794(a).  To state a claim under Section

504, AR must establish "(1) that he is a 'handicapped individual' under the Act, (2) that

he is 'otherwise qualified' for the benefit sought, (3) that he was discriminated against

solely by reason of his handicap, and (4) that the program or activity in question

receives federal financial assistance."  *Cohon ex rel. Bass v. N.M. Dep't of Health,* 646

F.3d 717, 725 (10th Cir. 2011) (internal brackets and citations omitted).

The ADA prohibits discrimination in public services furnished by governmental

entities and provides that:

> [N]o qualified individual with a disability shall, by reason of such disability,
> be excluded from participation in or be denied the benefits of the services,
> programs, or activities of a public entity, or be subjected to discrimination
> by any such entity.

42 U.S.C.A. § 12132.   To state a claim under the ADA, AR must prove that:  "(1) he is a

qualified individual with a disability; (2) he was excluded from the benefits or services of a public entity or otherwise was discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was because of his disability." *Cohon*, 646 F.3d at 725.  Section 504 and the ADA "involve the same substantive standards" and, therefore, are analyzed together.  *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1245 (10th Cir. 2009).  At their heart, both provisions require "meaningful access" to the services and benefits offered by a public entity.  *Cohon*, 646 F.3d at 717.

To recover compensatory damages for a violation of the ADA and Section 504, a plaintiff must prove that the defendant intentionally discriminated against the plaintiff. *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (citing *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)). "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'"  *Barber*, 562 F.3d at 1228  (quoting *Powers,* 184 F.3d at 1153)(other citation omitted).

> The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that ... likelihood."
>
> Turning to the level of intent required to satisfy the "failure to act" prong of the deliberate indifference test, a
>
>> "failure to act [is] a result of conduct that is more than negligent, and involves an element of deliberateness." Under the second element, "a public entity does not 'act' by proffering just any accommodation: it must consider the

> particular individual's need when conducting its investigation
> into what accommodations are reasonable."

*Id.* at 1222, 1229 (quoting *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir.2002)).

Defendants concede that AR is a qualified individual with a disability and that the District receives Federal financial assistance; the issue presented is whether the District excluded AR from benefits or services because of his disability.  Defendants contend that AR fails to state a claim under Section 504 and the ADA because he merely alleges "that the District failed to comply with the express terms of his IEP [and] other requirements under the IDEA," but fails to allege "that the District intentionally discriminated against AR or knew that harm to a federally protected right was substantially likely."  *Doc. 24* at 4.

The Court disagrees.  Plaintiffs' Complaint sets forth facts that, taken as true, establish AR was excluded from participation in and denied the benefits offered by the Las Vegas City Schools because of his visual impairment.  The failure to provide textbooks in Braille, and instruction to progress reading skills as well as exclusion from physical education, electives courses, and certain assignments, constitutes a denial of the participation in and benefits of public education because of a disability.

Defendants argue that Plaintiffs cannot recover compensatory damages under Section 504 and the ADA because "there are no allegations that plausibly show that the District intentionally discriminated against AR or actually knew that harm to a federally protected right was substantially likely."  *Doc. 24* at 14.  As discussed below, this argument is also without merit.

Intentional discrimination can be proved in two ways:  by direct evidence or by circumstantial evidence of deliberate indifference.  *Cinnamon Hills Youth Crisis Ctr., Inc.*

*v. Saint George City*, 685 F.3d 917 (10th Cir. 2012).  "Direct evidence of discrimination is evidence which, if believed, proves that the decision in the case at hand was discriminatory – and does so without depending on any further inference or presumption."  *Id.*  On the other hand, "circumstantial evidence" is indirect evidence that proves circumstances that tend to prove or disprove the existence or nonexistence of certain other facts.

According to the allegations, the District knew that AR was a visually impaired child returning to his home district for the fourth grade, yet they failed to provide textbooks and written materials in Braille.  The District failed to hire instructors that could teach AR to use Braille and utilize his assistive technology so he could access the general curriculum during and after school.  The District failed to ensure that AR had services necessary to fully participate in physical education and only allowed him one elective class instead of the two offered to his sighted peers.  These facts are sufficient to raise an inference that Defendants knew that it was substantially likely that AR would suffer harm to his federally protected rights under Section 504 and the ADA.  The failure, year after year, to provide even the most basic learning materials could demonstrate the element of deliberate indifference.  Thus, Plaintiffs state a claim for discrimination pursuant to Section 504 and the ADA.

Defendants argue that while AR alleges that he was not provided complete textbooks in Braille, he cannot establish he was treated any differently than other students because there is no allegation that the teachers or other students used the complete textbook.  This argument lacks merit.  In addition to prohibiting discrimination on the basis of a disability, the ADA requires that the Department of Justice promulgate

regulations in order to implement its non-discrimination provisions.  42 U.S.C. § 12134.

Again, "[t]he ADA requires more than physical access to public entities: it requires public

entities to provide '*meaningful access*' to their programs and services."  *Robertson v.*

*Las Animas County Sheriff's Dept*., 500 F.3d 1185, 1195 (10th Cir. 2007) (emphasis in

original).   Accordingly, the DOJ generated the commonly-called "effective

communications regulation" requiring that public entities "take appropriate steps to

ensure that communications with applicants, participants, members of the public, and

companions with disabilities are *as effective as* communications with others."  28 C.F.R.

§ 35.160(a) (emphasis added).  Thus,

> Title II and its implementing regulations, taken together, require public
> entities to take steps towards making existing services not just accessible,
> but *equally* accessible to people with communication disabilities, but only
> insofar as doing so does not pose an undue burden or require a
> fundamental alteration of their programs.

*K.M. ex rel. Bright v. Tustin Unified School. Dist*., 725 F.3d 1088, 1097 (9th Cir. 2013)

(emphasis in original).

Additionally, public entities must "furnish appropriate auxiliary aids and services

where necessary to afford individuals with disabilities . . .  an equal opportunity to

participate in, and enjoy the benefits of, a service, program, or activity of a public entity."

28 C.F.R. § 35.160.  While the type of auxiliary aid or service will vary from individual to

individual, "[i]n order to be effective, auxiliary aids and services must be provided in

accessible formats, in a timely manner, and in such a way as to protect the privacy and

independence of the individual with a disability."  28 C.F.R. § 35.160 (b)(2).  "In

determining what types of auxiliary aids and services are necessary, a public entity

must give primary consideration to the requests of individuals with disabilities."  *Id.*

AR alleges much more than that he was not provided complete textbooks in Braille.  AR maintains that the District failed to provide him with:  any textbooks in Braille for his social studies, science, Spanish, and math classes in fourth grade; Braille transcriptions of all or portions of textbooks and materials provided to sighted students in the fifth grade; and any textbooks and classroom materials in Braille for math, science, language arts, and Spanish classes in the sixth grade (*id.* at 19).  Clearly, the District cannot communicate the lessons effectively to AR if he does not have learning materials in a format that he can read or proper instruction on how to access the materials.  Second, even if, as the Defendants maintain, there are no allegations that the teachers and students used the entire textbook, AR's sighted classmates had meaningful access to course material that he did not.  Unlike his sighted peers, AR was denied the opportunity gain a deeper understanding of the material by reading unassigned textbook pages simply because he did not have access in Braille format.

AR alleges that he requires assistive technology in order to participate in the general curriculum, including an Apex Braille Note ("Apex") device and laptop computer.  While AR was allowed to take these devices home to assist him in completing his school work, after the Apex was accidentally damaged, he was no longer allowed to take the devices home.  Without these devices, AR was unable to access the information necessary to complete his homework assignments and, therefore, did not have an equal opportunity to participate in, and enjoy the benefits of his public school education.  Consequently, AR states a claim that the educational services were not equally accessible to him.

Finally, the District contends that the factual allegations in the Amended

Complaint demonstrate that the District was attempting to comply with its obligations and, therefore, AR cannot establish intentional discrimination.  This argument is also unavailing.  The list of actions taken by the District cannot suffice to excuse the deprivation of access to meaningful education for three years.

The District next argues that AR's discrimination claims fail because they involve "educational injuries" addressable under the IDEA.  *Doc. 24* at 18–21.   Specifically, the District contends that the claims under the ADA and Section 504 are duplicative and Plaintiff has already received relief in the IDEA administrative proceedings.  *Id.* Generally, "a plaintiff cannot recover twice for the same injury."  *Miller ex rel S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 455 F. Supp. 2d 1286,1314 (D.N.M. 2006). Accordingly, a plaintiff cannot recover under Section 504 and the ADA where relief has already been awarded by an administrative proceeding under the IDEA.  *Id.* at 1314- 1315. As the court in *Miller* observed:

> To the extent that the AAO already awarded *equitable relief* under the IDEA that remains in place under that statute's 'stay put' provisions and is no longer subject to challenge, it would appear that Plaintiff's ADA and Section 504 claims are moot insofar as they merely serve as a means of duplicating the *equitable relief* previously awarded under the ADA.

*Id.* at 1315 (emphasis added).

On the other hand, "a plaintiff may recover compensatory damages under § 504 and Title II in certain circumstances," such as upon a showing of intentional discrimination.  *Id.*; *Moseley v. Bd. of Educ. of Albuquerque Pub. Sch.*, 483 F.3d 698, 693 (10th Cir. 2007) (*citing Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)).   The availability of equitable relief under the IDEA does not limit the availability of compensatory damages under Section 504 and the ADA.  *Chavez ex rel.*

*Chavez v. Bd. of Educ. of Tularosa Mun. Sch.,* CIV 05-380 JB/RLP, 2008 WL 4816992,

* 13, (D.N.M. 2008) (*citing Mark H. v. Lemahieu*, 513 F.3d 922, 925 (9th Cir. 2008)).

"Congress has clearly stated its intent to preserve all remedies under [the Rehabilitation

Act] for acts that also violate the IDEA." *Id.* (quoting *Mark H.*) (brackets in original).[3]

"[T]he Tenth Circuit has not explicitly decided whether compensatory damages

are available under the IDEA." *Chavez v. Bd. of Educ. of Tularosa Mun. Sch.*, 614 F.

Supp. 2d 1184, 1215 (D.N.M. 2008), *aff'd in part, rev'd in part sub nom, Chavez ex rel.*

*M.C. v. New Mexico Pub. Educ. Dep't,* 621 F.3d 1275 (10th Cir. 2010).  The Tenth

Circuit has noted, however, that "most circuits hold that the IDEA does not permit

compensatory damages" and then, in dicta, indicated that it "see[s] no reason to depart

from the majority view." *Moseley*, 483 F.3d at 693 (citations omitted).

The Honorable M. Christina Armijo recently rejected the "duplicative relief"

arguments advanced by Defendants in *Johnny S. v. Pojoaque Valley School Dist.*, CIV

13-0027 MCA/KBM, *Doc. 64* (D.N.M. March 31, 2014).  In that case, Chief District

Judge Armijo explained:

> The DPHO awarded Plaintiff equitable relief and a monetary award for the
> "reimbursement for past transportation expenses."  Plaintiff did not seek
> and the DPHO did not award Plaintiff any compensatory damages for the
> alleged injuries identified in his Complaint: "serious physical injury,
> emotional damages for the alleged mental anguish, damage to his self-

---

[3]  The rule of construction for claims under the IDEA states:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and
> remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42
> U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et
> seq.], or other Federal laws protecting the rights of children with disabilities, except that
> before the filing of a civil action under such laws seeking relief that is also available under
> this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the
> same extent as would be required had the action been brought under this subchapter.

20 U.S.C.A. § 1415 (l).

esteem, and potentially irremediable developmental delays." **As previously explained, such compensatory damages are available under Section 504 and the ADA if the Plaintiff can prove intentional discrimination. Because Plaintiff was not awarded compensatory damages on his IDEA claim, the Court concludes that the relief sought on his Section 504 and ADA claims is not duplicative of the relief awarded by the DPHO.**

*Johnny S.*, *Doc. 64* at 28 (citations omitted) (emphasis added).

Similarly, here RM-G did not seek and the DPHO did not award compensatory damages, and the Complaint does not seek the same equitable relief sought in the administrative hearing pursuant to the IDEA.  Instead, the Complaint alleges that the District's violations of federal disability laws caused "emotional distress, mental anguish, damage to self-esteem, loss of enjoyment of life, and potentially irremediable academic delays" for which Plaintiffs seek compensatory monetary damages.  *Doc. 18* at 31, 36, 37.  Although Defendants correctly characterize the relief obtained by Plaintiffs in the administrative proceeding as "compensatory," the award was in the form of "compensatory education and injunctive relief" which, as the DPHO explained, "are both equitable remedies."  *Doc. 34-2* at 25.  Since Plaintiffs were not awarded compensatory damages on the IDEA claim, the relief sought on the Section 504 and ADA claims is not precluded as duplicative.

Not only are the remedies different under Section 504 and the ADA, but, as Chief District Judge Armijo explained, "the harms addressed by the two statutory schemes differ:" *Johnny S.,* CIV 13cv0027, *Doc. 64*, at 28.

In contrast to the IDEA, Section 504 emphasizes equal treatment, not just access to a FAPE. In other words, the drafters of Section 504 were not only concerned with [a student] receiving a FAPE somewhere (as was the case with the IDEA), but also that a federally funded program does not treat [the student] differently because [she is disabled].  Under Section 504, a state special school cannot hide behind the justification that

> another public school might provide a FAPE; it must show that somehow
> [the student] does not qualify for admission.  Unlike the IDEA, Section 504
> does not only look at what is a FAPE, but also what is fair.

*Id. at* 29 (quoting *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1281 n.22 (10th Cir.

2007)) (brackets in original).  For all of these reason stated above, Plaintiffs' claims

brought pursuant to Section 504 and the ADA survive the motion to dismiss.

B.  <u>Second and Third Causes of Action Brought Pursuant to Section 1983</u>

Generally, 42 U.S.C. § 1983 allows individuals to bring an action for damages

against an individual acting under color of law or a municipality who violates his rights

secured by the federal Constitution or federal statutes.  *Cillo v. City of Greenwood Vill.*,

739 F.3d 451, 459 (10th Cir. 2013).  To sustain a claim under Section 1983, a plaintiff

must first identify the specific right allegedly violated by the government actor.  *Myers v.*

*Koopman,* 738 F.3d 1190, 1194 (10th Cir. 2013).   In this case, Plaintiffs' second cause

of action alleges that the District violated their Fourteenth Amendment rights to

procedural due process and equal protection.  Plaintiffs' third cause of action alleges a

violation of AR's Fourteenth Amendment substantive due process rights based

specifically on the decision to have him participate in the "group counseling sessions." [4]

Because the Court finds below that Plaintiffs have not alleged that AR was

deprived of a protected property or liberty interest and have also failed to allege facts

sufficient to "shock the conscience," Plaintiffs' claims brought pursuant to § 1983 in both

the second and third causes of action are subject to dismissal.

---

[4] In their response brief, Plaintiffs argue that AR's participation in the group counseling sessions is also a
violation of his Fourth Amendment rights.  *Doc. 34* at 38.  However, nowhere in their complaint do
Plaintiffs claim that AR's Fourth Amendment rights were violated by Defendants.  Since no Fourth
Amendment claim has been plead, the Court will not address it.

1.  Due Process

The Fourteenth Amendment's Due Process clause states, "No State shall . . .

deprive any person of life, liberty, or property, without due process of law." U.S. Const.

amend XIV § 1. "The Due Process Clause encompasses two distinct forms of

protection: (i) procedural due process, which requires a state to employ fair procedures

when depriving a person of a protected interest; and (ii) substantive due process, which

guarantees that a state cannot deprive a person of a protected interest for certain

reasons." *Simon v. Taylor*, CIV 12-0096 JB/WPL, 2013 WL 5934024 (D.N.M. Oct. 29,

2013).

a.  Procedural Due Process

An alleged violation of the procedural due process required by this clause
prompts a two-step inquiry: (1) whether the plaintiff has shown the
deprivation of an interest in "life, liberty, or property" and (2) whether the
procedures followed by the government in depriving the plaintiff of that
interest comported with "due process of law."

*Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012).

In the education context, the United States Supreme Court has held that state

law providing for a free public education creates "a legitimate entitlement to a public

education as a property interest which is protected by the Due Process Clause." *Goss*

*v. Lopez*, 419 U.S. 565, 574 (1975). In *Goss*, the Court held:

When complete deprivation of education occurs, such as when a student
is removed from the school for a lengthy time period, . . . the student at
minimum is entitled to "notice and . . . some kind of hearing," though the
"timing and content of the notice and the nature of the hearing will depend
on the appropriate accommodation of competing interests involved.

*Id.* at 578-79.

Plaintiffs maintain that AR has "a protected liberty and property interest in his

public school education and the wide array of benefits and services that should have been made available to him." *Doc. 18* at 32.  Yet AR's protected property interest in a public education pursuant to New Mexico law does not extend to the "particular incidents of education" that compose the "educational process." *Seamons v. Snow*, 84 F.3d 1226, 1234-35 (10th Cir. 1996).  Indeed, the Tenth Circuit has interpreted *Goss* "to speak only in general terms regarding the 'educational process'" and not the specific components of education. *Id.* at 1235.  For example, participation in sports, taking certain classes, or attending a particular school, "[does] not create a property interest subject to constitutional protection." *Id.* (citing *Albach v. Odle*, 531 F.2d 983, 985 (10th Cir. 1976)).

In *Johnny S.*, Chief District Judge Armijo analyzed a similar case under § 1983 as did Judge Browning in *Chavez v. Bd. of Educ. of Tularosa Mun.Sch.*, CIV 05-0380 JB/RLP, 2006 WL 4060667 (D.N.M. Oct. 4, 2006).  In both cases, the courts found that since the plaintiff was not alleging that the district completely eliminated the student from school, they failed to state a claim for a protectable property or liberty interest under the Due Process Clause. *See Chavez*, 2006 WL 4060667  at *5; *Johnny* S., 13cv0027 MCA/KBM, *Doc. 64* at 32.

In this case, Plaintiffs argue that "there is a factual issue whether the length and extent of exclusion of AR from the core academic program, in fact, excluded AR from the educational process, without Due Process." *Doc. 34* at 33.   However, Plaintiffs do not allege that Defendants entirely excluded AR from an education.  Plaintiffs only allege that AR was deprived of specific components of his education, such as an additional elective, physical education class, and certain text books and learning

materials in Braille.  The allegations reveal that AR attended classes, had some materials in Braille, had some use of assistive technology, and was provided individualized instruction, including instruction outside of classroom hours.  While the education AR received may not have been of the quantity and quality he wanted or needed, the allegations cannot support a conclusion that there was a complete deprivation of the educational process.

Like the plaintiff in *Johnny S.*, AR relies on *Hariston v. Drosick*, 423 F. Supp. 180, 184 (S.D.W. Va. 1976) and *Cuyahoga County Ass'n for Retarded Children & Adults v. Essex*, 411 F. Supp. 46, 49 (N.D. Ohio 1976) to support his due process claim.  These cases hold that exclusion from a regular classroom to a special education classroom without notice and an opportunity to be heard may deny due process to a disabled child. Chief Judge Armijo rejected the rationale of these cases because "the Tenth Circuit has construed *Goss* more narrowly, holding that 'the innumerable separate components of the educational process . . . do not create a property interest subject to constitutional protection," *Johnny S.* CIV 13-0027 MCA/KBM at 34.  She therefore found that "[b]ecause Hariston and Cuyahoga conflict with Tenth Circuit case law, they are not persuasive." *Id.*  Chief Judge Armijo further found that the plaintiffs' reliance on *Brookhart v. Illinois State Board of Education*, 697 F2d 179 (7th Cir. 1983) and *Jackson v. Franklin County School Bd.*, 806 F.2d 623 (5th Cir. 1986) was misplaced.  *Johnny S.* at 34-35.  The Court agrees with Chief Judge Armijo's well-reasoned explanation for rejecting these cases and adopts her conclusions.

Since AR fails to allege facts that he was deprived of a constitutionally-protected property or liberty interest, his procedural due process claims must fail.

   b.  <u>Substantive Due Process</u>

Plaintiffs' substantive due process claim is limited to Defendant Castro-Garcia's requirement that AR participate in 50-minute "pull-out"[5] group counseling sessions once a week rather than 15-minutes per week on an as-needed basis as recommended by his IEP.  *Doc. 34* at 36-37.  Plaintiffs contend that this decision interfered with RM-G's parental "right to decide whether or not AR received mental health counseling at public school" and, as such, is a "clearly established violation of substantive Due Process. Plaintiffs are correct that "the Due Process Clause generally provides constitutional protection for parental rights," and that right extends generally to the right to make decisions about the child's medical care.  *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010).  However, decisions about AR's medical care are not at issue in this case.

As Defendants' point out, the Complaint does not allege that the "group counseling sessions" with Castro-Garcia amounted to mental health treatment.  Instead, Plaintiffs allegations suggest they were social work services designed to work on social skills such as how to express feelings, what to do when first meeting someone, and accentuating an individual's positive qualities.  *Doc. 18* at 24.

Moreover, a plaintiff carries a heavy burden in pleading a viable substantive due process claim given the standard used to assess if such a violation has occurred.

> The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges.  It is well settled that negligence is not sufficient to shock the conscience.  In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government

---

[5]   AR was required to miss an elective class that he enjoyed in order to attend the counseling sessions, hence the "pull-out" reference.

power.  *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir.2006) (internal quotation marks and citations omitted).  "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir.1995). This is a "high level of outrageousness." *Id.*

*Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222-23 (10th Cir. 2006).

Here, Plaintiffs describe a single pull-out session that included an activity with a basketball which caused AR to be struck in the face with the ball.  *Doc. 18* at 25.  AR was also asked to use his eyes to "track throughout the mazes" which he could not do because of his visual impairment.  *Id.*  Several sessions included creating "panoramic eggs," where small objects were placed inside a softball sized egg.  *Id.*  During one such session, AR left because he felt ignored, prompting Castro-Garcia to lecture AR, threaten to call his mother, and force him to return and apologize.  *Id.*

While these activities and actions appear inappropriate, insensitive, and even misguided, they do not rise to the level of a constitutional violation.  *See, e.g., Muskrat v. Deer Creek Public Schools*, 715 F.3d 775 (10th Cir. 2013) (holding that use of a timeout room and alleged physical abuse – a "pop" on the face, holding the plaintiff by the arm, and physically restraining him in his seat did not shock the conscience); *Harris v. Robinson*, 273 F.3d 927 (10th Cir. 2001) (holding a teacher who made a ten-year-old, mild to moderately retarded boy clean a toilet with his bare hands did not shock the conscience).  *But see Garcia by Garcia v. Miera*, 817 F.2d 650, 655 (10th Cir. 1987) (holding that beating a nine-year-old girl with a paddle such that she bled and had bruises shocked the conscience).  Because the allegations are insufficient to support a necessary finding of outrageousness, the Court will grant Defendants' motion to dismiss Plaintiffs' substantive due process claim.

c. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citation omitted).

> Different types of equal protection claims call for different forms of review. A claim that a state actor discriminated on the basis of a suspect (e.g., race), quasi-suspect (e.g., gender), or a non-suspect classification calls for strict, intermediate, or rational basis scrutiny, respectively. *See Price–Cornelison v. Brooks*, 524 F.3d 1103, 1109–10 (10th Cir.2008). But in each instance, "to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir.1998).

*Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011).

The Supreme Court has held that disabled persons do not constitute a suspect class for purposes of equal protection analysis, *Cleburne*, 473 U.S. at 446, and that education is not a fundamental right, *Plyler v. Doe*, 457 U.S. 202, 223 (1981). In the absence of either a suspect classification or the denial of a fundamental right, to state an equal protection claim, Plaintiffs must allege that AR was treated differently than similarly situated individuals due to intentional or purposeful discrimination, and that this different treatment lacked a rational basis. *Garcia v. N.M. Office of the Treasurer*, 959 F. Supp. 1426, 1432 (D.N.M. 1977) (citing *Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995)) (other citations omitted); *Ebonie S. ex rel. Mary S. v. Pueblo School Dist. 60*, 819 F. Supp. 2d 1179, 1189-90; *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

The first step in analyzing an equal protection claim based on disability is to establish that the plaintiff was treated differently from similarly situated persons.  *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011); *Tonkovich*, 159 F.3d at 533 ("It is not necessary for us, however, to consider the specific allegations against each defendant because at the heart of any equal protection claim must be an allegation of being treated differently than those similarly situated."); *Pierce v. County of Orange*, 526 F.3d 1190, 1225 (9th Cir. 2008).  "To be 'similarly situated' the individuals 'must be prima facie identical in all relevant respect or directly comparable in all material respects; although this is not a precise formula, it is nonetheless clear that similarly situated individuals must be very similar indeed.'"  *Ebonie S.*, 819 F. Supp. 2d at 1189 (quoting *U.S. v. Moore*, 543 F.3d 891 (7th Cir. 2008)).  In *Ebonie S.*, the court determined that a child with Down syndrome and a variety of other disabilities was not similarly situated to non-disabled students because, while some non-disabled students may have displayed similar behavioral disruptions, they did not have an IEP or behavior support plan.  *Id.* at 1189.  The court found that "Plaintiff's equal protection claim must be based on a comparison of Ebonie S.'s peers in [the special education] classroom – that is, the other disabled students . . . ." *Id.* at 1189-90.

Plaintiffs do not specifically state that AR is "similarly situated" to other students, yet throughout the Complaint, they compare AR's experience with his "non-disabled peers," and "sighted students."  *Doc. 18* at 4, 18, 12 ("non-disabled classmates"), 13, 14, and 36.  This is not a suitable comparison for analyzing the equal protection claim. Having not met this threshold element, Plaintiffs' equal protection claim must fail.  *See, e.g., Ebonie S.,* 819 F. Supp. at 1189-91; *A.B. ex rel B.S. v. Adams-Arapahoe 28J*

*School Dist.*, 831 F. Supp. 2d 1226, 1254 (2011) (holding that plaintiffs failed to show

A.B. was similarly situated to other students because there was no evidence that other

students had similar behavior issues or were under similar behavior management

plans).

    C. <u>Qualified Immunity</u>

    The Court further finds that Defendants are entitled to qualified immunity on

Plaintiffs' due process and equal protection claims.

> Government defendants sued under § 1983 in their individual capacities
> have qualified immunity: "government officials are not subject to damages
> liability for the performance of their discretionary functions when their
> conduct does not violate clearly established statutory or constitutional
> rights of which a reasonable person would have known."

*Brown*, 662 F.3d at 1164 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993).

Courts engage a two-part test when analyzing a qualified immunity defense.  "In

resolving a motion to dismiss based on qualified immunity, a court must consider

whether the facts that a plaintiff has alleged make out a violation of a constitutional right,

and whether the right at issues was clearly established at the time of defendant's

alleged misconduct." *Id.* (quoting *Leverington v. City of Colorado Springs*, 643 F.3d 719,

732 (10th Cir. 2011)).  This Court may determine "which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." *See id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236

(2009)).  Both prongs must be satisfied for Plaintiffs to avoid a finding of qualified

immunity.  *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002) (citing *Gross

v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir. 2001)).

As discussed above, Plaintiffs' Section 1983 claims as pled are not viable.  Even if they were, however, the law was not clearly established at the time the alleged misconduct occurred.  Thus, the individual defendants are entitled to qualified immunity and will be dismissed.

Plaintiffs failed to address Defendants' argument that the claims against Defendant Martinez in her official capacity should be dismissed as duplicative of claims against the District.  Indeed, a suit brought against an individual in his official capacity is really "only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099 (1985) (quoting *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166, 105 S. Ct. 3099.  Accordingly, the motion to dismiss Plaintiffs' claims against Defendant Martinez in her official capacity will be granted.

D. <u>Supervisory Liability</u>

"[A] School District and its policy makers may not be held liable pursuant to § 1983 unless one of the School District employee's committed a constitutional violation and a School District policy or custom was the moving force behind the constitutional deprivation." *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1174 (D. Colo. 2001) (citing *Monell,* 436 U.S. at 695; *Myers v. Okla. County Bd. of County Comm'rs,* 151 F.3d 1313, 1317 (10th Cir. 1998)).  In this case, as in *Castaldo*, "Plaintiffs have not made the requisite predicate showing of an underlying constitutional violation."  *Id.* at 1174. Therefore, Plaintiffs are unable to state a viable claim for supervisory liability.

A.  <u>Declaratory and Injunctive Relief</u>

Defendants criticize Plaintiffs for inserting claims for declaratory and injunctive relief into their "Prayer for Relief" instead of pleading a separate cause of action. Plaintiffs respond that because the ADA provides for a private right of action that includes the "full panoply of remedies," they properly asserted declaratory and injunctive relief in their prayer.  Indeed, Plaintiffs specifically referred to their first cause of action as the source for the equitable relief they request in their prayer for relief   *Amended Complaint* at 38, ¶ 2 ("For Count I, declaratory and injunctive relief, mandating that the District comply with all applicable regulations promulgated pursuant to the Americans with Disabilities Act and Section 504. . . .").  Given Plaintiffs' clarification in its response brief and the Court's conclusion that Count I states a viable claim under those statutory provisions, the Court finds this request for clearly prospective relief to be sufficiently pled.

B.  <u>Attorney's Fees</u>

The parties are in agreement that the issue of attorney's fees for the administrative proceedings is premature and will be addressed in the related DPOH appeals, which are also before this Court.

Wherefore,

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to State a Claim and for Qualified Immunity (*Doc. 24*) is granted in part and denied in part as follows:

1) Defendants' Motion to Dismiss Plaintiffs' First Cause of Action under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act is **denied**;

28

2) Defendants' Motion to Dismiss Plaintiffs' Second  and Third Causes of Action brought pursuant to 42 U.S.C. § 1983  for alleged violations of procedural and substantive due process and equal protection is **granted**;

3) Defendants' Motion to Dismiss Plaintiffs' Fourth Cause of Action for attorney's fees and costs will be determined in conjunction with the consolidated appeals;

4) Because the individually-named Defendants in their individual capacities are entitled to qualified immunity, the claims against them are hereby **dismissed with prejudice** as well as the claims against Defendant Martinez in her official capacity on the basis that they are duplicative of claims against the District;

5) Defendants' Motion to Dismiss Plaintiffs' claim for supervisory liability is **granted,** and

6) Defendants' Motion to Dismiss Plaintiffs' requests for declaratory and injunctive relief are **denied**.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE